**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA,**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| THE 1791 FOUNDATION, INC., F/K/A THE NRA FOUNDATION, INC. <br><br> *Plaintiff,* <br><br> v. <br><br> THE NATIONAL RIFLE ASSOCIATION OF AMERICA, INC. <br><br> *Defendant.* | Civil Action No.: |

**COMPLAINT**

Plaintiff The 1791 Foundation, Inc. (formerly known as The NRA Foundation, Inc.) ("Foundation") brings the following claims against Defendant the National Rifle Association of America, Inc. ("NRA"), as follows:

**I.**

**PRELIMINARY STATEMENT**

1. This case is about greed, deception, and retaliation. For more than three decades, the Foundation raised hundreds of millions of dollars in tax-deductible charitable contributions to fund firearms safety education, youth shooting sports, law enforcement training, and other programs that benefit the public. The Foundation did so lawfully, independently, and extraordinarily well (including making wise investment decisions)—and has amassed more than $200 million in net assets, earning the trust of tens of thousands of donors nationwide.

2. The NRA, however, views the Foundation not as an independent charity, but as a piggy bank. Facing mounting financial losses, hemorrhaging membership revenue, and still reeling from a jury verdict finding that its senior management breached fiduciary duties and engaged in

self-dealing, the NRA turned its sights on the Foundation's assets. When the Foundation refused to buy the NRA's headquarters building, declined to pay $800,000 to the NRA for a collection of firearms that had no connection to the Foundation's charitable purposes, declined to pay more than $2 million in excess overhead costs for the 2026 calendar year, and rejected a sham "royalty" demand of 20% of all Foundation revenue for the Foundation to continue using its legal name—a demand the NRA itself admitted had no basis in fair market value—the NRA retaliated.

3.      The NRA cut off the Foundation's access to its own donor lists, locked Foundation management out of Foundation social media accounts, barred the Foundation from overseeing its own fundraising events, and then—using the very donor relationships and goodwill the Foundation spent decades and tens of millions of dollars building—launched a competing charity and repurposed at least one other to siphon away the Foundation's donors and revenue. The NRA publicly blamed the Foundation for "slashing support" for NRA programs. In reality, the Foundation pledged over $7 million in grant funding to the NRA while insisting that more of those funds go to direct NRA charitable programming instead of NRA's bloated overhead.

4.      In response, the NRA sued the Foundation in the U.S. District Court for the District of Columbia, claiming trademark violations for the Foundation's use of its own name, breaches of contract and trust for the Foundation's refusal to blindly hand over money to the NRA on demand, and *ultra vires* violations of the Foundation's organizational documents based on the Foundation's lawful governance reforms. The district court later dismissed (without prejudice) all but the trademark claims for lack of jurisdiction.

5.      Despite its apparent wish to completely dissociate from the Foundation, the NRA has also refused to promptly return valuable artwork and firearms collections that were donated to the Foundation.

6.      But beyond retaliating against the Foundation, the NRA took action to deceive its auditors and the public. Recognizing that deconsolidation of the Foundation from the NRA for accounting purposes would strip approximately $176 million in net assets from the NRA's financial statements—likely triggering a going-concern qualification that would reveal the NRA's true financial condition to its creditors and the public (including its members and donors)—the NRA filed its lawsuit as a pretext to tell its auditor that the Foundation's lawful governance reforms were invalid and that the NRA still "controls" the Foundation. The NRA then directed two of its own employees—who held dual NRA/Foundation finance titles—to sign a Management Representation Letter to the NRA's auditor on the Foundation's behalf, from the NRA's headquarters, using NRA email addresses, without the knowledge, authorization, or consent of the Foundation's actual management or Board. That letter falsely represented to the auditor, on behalf of the Foundation, that the NRA had "maintained control over the Foundation" and that the Foundation's governance amendments "did not follow regulatory and legal requirements." The Foundation's Board and management never saw, reviewed, or approved this letter.

7.      The Foundation brings these claims to hold the NRA accountable for its tortious interference with the Foundation's donor contracts and business relationships, its fraudulent misrepresentations to auditors and the public, and its conversion of property donated to the Foundation. The Foundation seeks declaratory and injunctive relief and damages sufficient to remedy the NRA's systematic campaign to commandeer the Foundation's assets, mislead the public about its own financial health, and punish the Foundation for daring to operate as the independent charity it has always been.

## II.

### JURISDICTION AND VENUE

8.      This Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the NRA has its principal place of business in this district and is subject to personal jurisdiction here and a substantial part of the events giving rise to these claims occurred in this District.

## III.

### PARTIES

10.      Plaintiff, The 1791 Foundation, Inc. (formerly known as "The NRA Foundation, Inc."), is a nonprofit corporation organized under the laws of the District of Columbia, exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code ("IRC"). The Foundation's principal place of business is 5875 W Van Horn Tavern Road, Suite Q, Columbia, Missouri 65203. Thus, the Foundation is a citizen of D.C. and Missouri.

11.      Defendant the National Rifle Association of America, Inc. is a not-for-profit corporation organized under the laws of the State of New York, exempt from federal income taxation under Section 501(c)(4) of the IRC. Its principal place of business is at 11250 Waples Mill Road, Fairfax, Virginia 22030. Thus, the NRA is a citizen of New York and Virginia.

## IV.

### ALLEGATIONS

A.      **Legal Background Relevant to this Dispute.**

12.      Federal tax law provides relevant context for this dispute. While most nonprofit corporations are exempt from paying federal and state income taxes, the federal tax code confers

4

an additional benefit on organizations exempt from taxation under Section 501(c)(3) of the IRC, like the Foundation, by allowing donors to claim a personal tax deduction for their donation. I.R.C. § 170(a), (c)(2).

13.    To qualify and maintain Section 501(c)(3) tax-exempt status, a nonprofit must (1) be organized exclusively for exempt purposes (such as charitable, scientific, and educational purposes); (2) engage primarily in activities that accomplish those purposes; (3) devote no more than an insubstantial part of its activities to lobbying; (4) not participate or intervene in political campaigns; and (5) not share profits with any private shareholders or individuals. 26 C.F.R. § 1.501(c)(3)-1(a)(1), 1(b), 1(c), 1(d).

14.    Social welfare organizations exempt under Section 501(c)(4) of the IRC, like the NRA, can engage in lobbying and other partisan activities, but they cannot receive tax-deductible donations. I.R.C. § 170(a), (c)(2). IRS guidance contemplates that Section 501(c)(4) organizations may affiliate with Section 501(c)(3) organizations to pursue a shared charitable mission, but the two entities must remain separate, and the 501(c)(3) organization's funds may only be used for qualifying charitable purposes.

15.    Critically, the NRA, as a 501(c)(4) entity, does not and cannot raise or solicit charitable funds. The Foundation has always raised its own tax-deductible, charitable funds—some *but not all* of which have been used to fund the NRA's qualifying 501(c)(3) programs.

**B.    <u>Accounting Background Relevant to this Dispute.</u>**

16.    Consolidation is a financial reporting process where legally separate entities are presented as a single organization to provide a transparent view of the organization's total financial

reality. Accounting Standards Codification ("ASC")[1] 958-810 is the Generally Accepted Accounting Principles ("GAAP") standard governing when one nonprofit must consolidate another entity into its financial statement. Under this standard, consolidation of financial statements is appropriate only when the nonprofit entity has **both** control and an economic interest in the other entity.

17.     Control is defined as the direct or indirect ability to determine the direction of another organization's management and policies.[2] Control often exists indirectly through governance structures, such as when one organization has the authority to appoint a majority of another entity's board.[3] A nonprofit organization has an economic interest in another nonprofit entity when financial outcomes are meaningfully connected, such as when one nonprofit is responsible for the liabilities of another or when one entity holds significant resources that must be used for the other.[4]

18.     Under this standard, to include the Foundation's assets in its consolidated financial statement, the NRA must demonstrate that it both controls the Foundation and has an economic interest in the Foundation. Because the Foundation's cash and net assets account for nearly 70% of the NRA's consolidated cash and net assets, deconsolidation raises serious questions about the NRA's ability to continue to operate as a going concern.

---

[1] The Accounting Standards Codification, or ASC, is the authoritative source of U.S. generally accepted accounting principles recognized by the Financial Accounting Standards Board (FASB) applicable to nongovernmental entities.
[2] ASC 958-810-25.
[3] ASC 958-810-25-3.
[4] ASC 958-810-55-6.

**C.**    **The Foundation Is a Long-Standing Successful Charity.**

19.    On August 3, 1990, the NRA formed The NRA Foundation, Inc. as a District of Columbia nonprofit corporation. According to its Articles of Incorporation ("Articles"), the Foundation was formed for charitable purposes to promote firearms and hunting safety, educating individuals with respect to firearms in their historic, technological, and artistic context, and enhancing marksmanship skills of those participating in the shooting sports. Its Articles also state that another *one* of the Foundation's purposes (among several) is to "support the activities of the [NRA], but only to the extent that such activities are in furtherance of charitable, educational and scientific purposes within the meaning of section 501(c)(3)." In other words, the Foundation was formed was to do what the NRA, as a social welfare organization, could not do: raise tax-deductible charitable contributions to promote firearms and hunting safety, educate individuals with respect to the historic, technological, and artistic context of firearms, and enhance marksmanship skills for shooting sports, along with supporting the NRA's qualifying educational, scientific, and charitable programs.

20.    On April 17, 1991, the Internal Revenue Service determined the Foundation qualified as a charity exempt from taxation under 501(c)(3). Since that time, the Foundation has been incredibly successful. As of December 31, 2024, the Foundation has more than $200 million in net assets, including, among other things, approximately $30 million in cash, a building in Missouri that is valued over $20 million, more than $115 million in investments, and a premiere firearms museum collection valued at over $35 million.

21.    Since its inception, the Foundation has funded hundreds of millions in grants to benefit educational programs, school safety, law enforcement training, range development, and firearm training, education, and safety. Common Foundation grant recipients include 4-H shooting

sport programs, Junior Reserve Officers' Training Corp, Future Farmers of America, and over 140 local Boy Scouts of America councils. In 2024, alone, the Foundation funded more than $17 million in grants with approximately $7 million going to NRA charitable programs.

22.     Over the years, some of these funds were raised through the "Friends of NRA" program, which were nationwide grassroots fundraising events 100% paid for by the Foundation. Each year, NRA employees, known as Field Representatives whose salaries and benefits were 100% paid by the Foundation, worked with local organizers to host hundreds of Friends Events. To encourage local participation, the Foundation earmarked 50% of funds raised by Friend Events to support qualified local groups and programs. Local committees, known as state fund committees, worked with the Foundation to identify and vet qualifying groups and programs to use these funds in the communities in which they were raised. The remaining funds typically went to the NRA's qualifying programs. It was never the case that all funds raised through Friends events were used to fund NRA activities exclusively.

### D.     The Foundation's Relationship with the NRA.

23.     The Foundation's Articles of Incorporation—prepared by representatives engaged by the NRA—expressly provide that the name of the corporation "shall be The NRA Foundation, Inc." The NRA consented to the use of "NRA" in the Foundation's name by expressly consenting to it in a perpetual corporate charter. In 1998, the NRA also granted the Foundation a non-exclusive, non-transferable, limited license to use the trademark "NRA" in the name "NRA Foundation" and other NRA trademarks free of charge. To the Foundation's knowledge, the license has never been terminated according to its terms.

24.     Until recent changes, the NRA and the Foundation shared overlapping officers and directors. The Foundation's Bylaws provided, among other things, that the (1) NRA's Board of

8

Directors would elect the Foundation's Board of Trustees; (2) a majority of the members of the Board of Trustees would be Directors of the NRA; and (3) the NRA Executive Vice President and the NRA President were *ex officio* members of the Foundation's Board.

25.     Despite overlapping officers and directors, the Foundation's Board was separate from the NRA's Board, and, at all times, acted independently from the NRA's Board. In particular, the Foundation's Board—not the NRA—set Foundation policies and oversaw fundraising and grantmaking efforts.

26.     In an effort to leverage efficiencies, the Foundation did not hire any of its own employees. Instead, as is common for affiliated nonprofits, the Foundation entered into a cost-sharing agreement with the NRA, where the Foundation reimbursed the NRA for employees and other overhead expenses necessary to carry out the Foundation's operations.

27.     Under the Shared Services Agreement,[5] the Foundation would pay the NRA for its share of overhead costs, direct costs, and rent for office space. The NRA also made its employees available to perform various services for the Foundation, and the Foundation reimbursed the NRA based on the proportion of salaries and fringe benefits expended by the employees on behalf of the Foundation. For example, the Foundation paid the NRA's Office of the Treasurer to perform certain accounting functions for the Foundation, including, among other things, maintaining its general ledger and preparing the Foundation's annual financial statements. The Foundation also used the NRA's Office of General Counsel to provide in-house legal support on a variety of topics,

---

[5] The parties' Shared Services Agreement, which entitles the Foundation to its property, documents, and records, contains an arbitration provision. While the NRA refuses to return all of the Foundation's documents and property, the Foundation is pursuing these claims through arbitration as required by Agreement. The claims at issue here fall outside the scope of the Shared Services Agreement's arbitration provision. The Shared Services Agreement is referred to here to provide relevant background on the Foundation's relationship with the NRA.

such as gaming licenses, contracts, fundraising, grantmaking, compliance, and other issues. In 2025, alone, the Foundation paid 100% of the salaries and benefits of more than fifty NRA employees, and it paid a portion of the salaries and benefits of at least sixty other employees.

28.     This arrangement worked for decades, and the Foundation was able to raise tens of millions for NRA's charitable programs, including hallmark programs such as the Eddie Eagle GunSafe® program, which teaches children to "Stop," "Don't Touch," "Run Away," and "Tell a Grown-up" if they encounter a firearm, and the Refuse to Be a Victim program, which teaches personal safety strategies grounded in awareness and avoidance.

### E.     The NRA Has a History of Jeopardizing Foundation Assets.

29.     In 2018, reports questioning the financial health of the NRA began to surface, as the NRA's balance sheet showed that expenses were outpacing revenue.[6] Reports of excessive legal and vendor expenses prompted the New York Attorney General to launch an investigation into the NRA, because it is a nonprofit organization incorporated in and subject to the laws of New York. In August 2020, the New York Attorney General sued the NRA, alleging that (1) NRA officers diverted millions of nonprofit funds on luxury travel and personal expenses, and (2) the NRA board failed to exercise independent judgment and approved improper expenditures, including conflicted insider transactions.[7]

30.     Meanwhile, the Attorney General for the District of Columbia ("DC AG"), who has regulatory authority over the Foundation as a DC nonprofit corporation, launched an investigation into whether the NRA had improperly used Foundation assets. On August 6, 2020, the DC AG sued the NRA and the Foundation, alleging that "the Foundation's Board of Trustees and

---

[6] Brian Mittendorf, *The NRA's Financial Weakness, Explained*, ATLAS INST. FOR INT'L AFFS. (Dec. 16, 2018), https://atlasinstitute.org/the-nras-financial-weakness-explained/.

[7] *State of New York v. Nat'l Rifle Ass'n of Am., Inc.*, No. 451625/2020 (N.Y. Sup. Ct. 2020).

executives are dominated by the NRA, and the NRA had subverted the Foundation's independence," permitting the Foundation to be "financially exploited through, among other things, unfair loans and management fee payments to the NRA."[8] The DC AG alleged that, to "plug financial holes caused by [the NRA's] own poor management, the NRA turned to the Foundation's funds," *id.*, using "its control over the Foundation to raid" those funds through a series of loans, a management fee, and grants to the NRA.[9]

31. The DC AG further alleged that the Foundation's organizational structure permitted the NRA to exercise too much control over the Foundation's assets. Specifically, the DC AG highlighted that trustees had to be elected by the NRA's Board of Directors, a majority had to also serve as NRA Directors, and the NRA President and Executive Vice President were automatic members with "full powers."[10] According to the DC AG, as a result of this structure, the Foundation Board "repeatedly chose to serve the interests of the NRA above those of the charitable nonprofit purposes of the Foundation,"[11] and jeopardized the Foundation's "nonprofit purpose and independence from the NRA."[12]

32. Through this action, the DC AG sought to impose a constructive trust "over Foundation funds improperly diverted to the NRA," to modify the Foundation's governance policies, including the replacement of trustee membership, to ensure independence from the NRA, and to appoint "an independent receiver or other Court-supervised official" to monitor all Foundation financial decisions and oversee modifications to the Foundation-NRA relationship.[13]

---

[8] Amended Complaint ¶ 2, *District of Columbia v. NRA Foundation, Inc.*, No. 2020 CA 3454 B (D.C. Super. Ct. 2020).
[9] *Id.* ¶¶ 37, 39–40, 53, 56–57.
[10] *Id.* ¶¶ 29–31.
[11] *Id.* ¶ 28.
[12] *Id.* ¶ 73.
[13] *Id.*, Prayer for Relief.

33.     The Foundation mounted an aggressive defense to establish that, during the relevant period, the Foundation had not allowed its charitable funds to be misused. Indeed, even the DC AG's own experts conceded they were aware of no evidence that Foundation funds were used for impermissible purposes.[14]

34.     As a result, the parties entered a Consent Judgment on April 16, 2024. The DC AG abandoned its demand to subject the Foundation to a constructive trust or monitorship. The Foundation did, however, agree to implement certain compliance and governance reforms. These included, among other things, (1) conducting annual board and officer training on conflicts of interests and related-party transactions; (2) forming an audit committee independent from the NRA; (3) adopting a conflict-of-interest policy separate from the NRA's policy; (4) implementing a grant agreement and certain grantmaking procedures for grants to the NRA; (5) adopting a new shared services agreement with the NRA; (6) implementing a policy governing loans to the NRA; and (7) making certain reports to the DC AG regarding the new policies and procedures for a discrete period of time.[15]

35.     The same could not be said for the NRA in the New York Attorney General matter, however. Following trial, the jury found that NRA senior management, such as Wayne LaPierre, then-NRA Chief Executive Officer/Executive Vice President, and Wilson Phillips, then-NRA Chief Financial Officer/Treasurer, breached fiduciary duties and engaged in self-dealing. It also

---

[14] Defendant The NRA Foundation, Inc.'s Motion for Summary Judgment, Statement of Undisputed Material Facts ¶¶ 47, 78, 105–06, *District of Columbia v. NRA Foundation, Inc.,* No. 2020 CA 3454 B (D.C. Super. Ct. 2020).

[15] Consent Judgment at 3–7, *District of Columbia v. NRA Foundation, Inc.,* No. 2020 CA 3454 B (D.C. Super. Ct. 2020).

found that the NRA failed to properly administer charitable funds and made false statements on regulatory filings, resulting in monetary liability and remedial governance measures.[16]

  **F.**  **The Foundation Has Taken Lawful Steps to Increase Its Independence.**

36.  Consistent with the Consent Judgment, the Foundation implemented the required governance reforms and provided related documentation to the DC AG in July 2024. One month later, the Foundation decided to voluntarily implement some of the structural changes advanced by the DC AG in litigation. Specifically, on August 20, 2024, the Foundation provided notice of a special meeting to vote on amendments to the Foundation's Articles of Incorporation and Bylaws. The proposed amendment to the Articles lifted the cap on the number of trustees on the Foundation's board to a number set by the Foundation's Bylaws.[17] The proposed amendment to the Bylaws also (1) changed the requirement that the NRA's Board of Directors appoint the Foundation trustees, so that the Foundation's Board appointed its own trustees (which is a common practice of public charities such as the Foundation); (2) eliminated the requirement that the Foundation Board of Trustees be majority NRA directors; and (3) removed the voting power from the NRA President, who had an *ex officio* position on the Foundation's Board.

37.  While nothing in the Foundation's organizational document required the NRA to approve changes to the Foundation's organizational documents, the NRA had full knowledge of the meeting and proposed changes. Doug Hamlin—the NRA's Executive Vice President and CEO who held an *ex officio* seat on the Foundation's Board—was sent the proposed amendments to the

---

[16] Brian Mann & Emma Bowman, *Jury Finds NRA, Wayne LaPierre Liable in Civil Corruption Case*, NPR (Feb. 23, 2024), https://www.npr.org/2024/02/23/1232229060/nra-wayne-lapierre-corruption-trial-verdict-new-york.

[17] At some point prior to 2016, the NRA Board began appointing more than 9 trustees to the Foundation's Board. The limit on the total number of trustees was changed in the Foundation's Bylaws but not its Articles. The amendment to the Articles was therefore to fix this administrative issue created by the NRA.

Bylaws and Articles of Incorporation on August 21, 2024, prior to the meeting. Hamlin reviewed the proposed amendments, asked questions about them, and confirmed he agreed with the proposed amendments. Specifically, Hamlin wrote on August 22, 2024: "As long as I can still make recommendations/requests regarding additional funding for education and training and youth programs, etc., within general operations, I'm OK with it." Then-NRA President Bob Barr and then-NRA Treasurer and CFO, Sonya Rawlings, also attended the August 23, 2024 meeting and made no objection to the motion to amend the Bylaws. The Board overwhelmingly approved the proposed changes—eleven in favor and one against. Moreover, nine of the eleven trustees who voted in favor of the amendments were current directors on the NRA's Board.[18]

38.    In an effort to increase its oversight over the Foundation's operations, the trustees hired an independent management team, beginning with Peter Churchbourne as Executive Director in July 2025, David Coy as Treasurer (and later CFO) in September 2025, and Skipp Galythly as General Counsel in December 2025. None of these individuals are currently affiliated with the NRA.

39.    One of the roles of the new management team is to administer the Foundation's Grantmaking Policy with the NRA. The Grantmaking Policy, first adopted by the Foundation's Board of Trustees in 2024 and updated on September 16, 2025, established rigorous procedures to ensure that Foundation grants to the NRA are used exclusively for qualifying 501(c)(3) purposes. Among other things, the Grantmaking Policy requires the NRA to: (a) submit written grant applications for each program that requests funding, including granular-level grant budgets; (b) enter into an omnibus written Grant Agreement containing requirements for post-grant

---

[18] In July 2025, the Foundation further amended its Bylaws to remove the requirement that the President of the NRA be an *ex officio* Trustee.

reporting, limitations on the use of grant funds, prohibitions on lobbying and political activity, and the return of unused grant funds; (c) submit requests to Foundation staff identifying the specific charitable program and providing supporting documentation demonstrating how funds are spent; and (d) participate in quarterly meetings between the Foundation Executive Director and the NRA's Executive Director of General Operations to review financial and program progress.

40.     Critically, the Grantmaking Policy provides that the Foundation's Board retains the right to reject any application for grant funding by the NRA, and requires the Board to determine whether grants are fair and equitable to the Foundation and its financial well-being and are consistent with the Foundation's charitable and educational mission. The Foundation's Executive Director also conducts quarterly reviews of the NRA's use of all Foundation grant funds to gain reasonable assurance that granted funds are being used consistent with the written Grant Agreement, with any non-compliant funds required to be returned to the Foundation.

### G.     <u>The NRA Renews Its Effort to Improperly Control Foundation Assets.</u>

41.     The Foundation Board's desire to create a greater degree of independence from the NRA was justified and well founded. Following the New York AG litigation, the NRA's financial position continued to deteriorate. According to the NRA's auditors, the NRA experienced net losses throughout 2024 in membership, dues, and other financial support, and had to liquidate more than $40 million of its investment portfolio "to reduce debt and provide funding for operations."[19]

42.     With more than $200 million in net assets, on the other hand, the Foundation's coffers are an attractive target for the NRA, and the Foundation's corporate governance

---

[19] Dave Levintha & Violet Jira, *The NRA Is Selling Off Its Investments to Make Ends Meet*, NOTUS (Dec. 12, 2025), https://www.notus.org/money/nra-national-rifle-association-selling-investments-stock-money-audit.

improvements were intended to and, in practice have, further amplified the Foundation's ability to resist the NRA's improper attempts to use the Foundation's assets to subsidize its operations.

43.     First, in 2025, the NRA approached the Foundation about purchasing the NRA's headquarters building in Fairfax, Virginia. The Foundation declined this request. Then, around August 2025, the NRA approached the Foundation about purchasing a collection of firearms from the NRA for over $800,000. The firearms at issue were of no historical significance (as would further the Foundation's charitable purpose) and certainly not worth the NRA's asking price. The Foundation declined this request as well.

44.     The NRA, still desperate for money, started becoming more hostile towards the Foundation and demanded that the Foundation pay a new "royalty" to use the Foundation's own legal name equal to 20% of all Foundation revenue. This is true, notwithstanding the NRA's admission that the 20% "royalty" had no tie whatsoever to fair market value or the fact that the Foundation had been using its own legal name, The NRA Foundation, Inc., pursuant to its Articles of Incorporation, and had used the NRA's marks pursuant to a valid written license, free of charge, for decades. The Foundation once again refused to participate in the NRA's bald attempt to violate tax laws by using (c)(3) charitable funds to subsidize the NRA's (c)(4) operations under a sham royalty arrangement.[20]

45.     The Foundation Board, supported by the Foundation's new management, was able to exercise increased oversight over the Foundation's fundraising and grantmaking activities. For example, Foundation management had to intervene when the NRA's Executive Vice President,

---

[20] Even if such an arrangement were lawful (it is not), it would have significantly diluted the Foundation's available grant dollars for qualified local groups and programs, while any dilution of the NRA's available grant dollars could be made up for in grants from its other affiliated (c)(3) entities.

Doug Hamlin, repeatedly made partisan statements when speaking at Foundation fundraisers—in violation of federal tax law and the Foundation's policies.

46.    Foundation management also investigated opportunities for additional cost-savings, so that more donor dollars could go to charitable programs. The Foundation, unlike the NRA, operates efficiently and supports the full scope of its charitable mission with a lean staff. Despite the Foundation's efforts to minimize overhead costs, the NRA's funding requests increasingly sought to have the Foundation's charitable dollars absorb a wider range of costs beyond direct charitable programming, including allocations for executive compensation, employee benefits, insurance costs, and debt-related expenses. In 2026, the Foundation declined to approve more than $2 million in NRA funding requests because those requests included overhead and expense allocations the Foundation concluded were inconsistent with its responsibilities to be good stewards of donor funds.

47.    Notwithstanding the Foundation's unwillingness to fund the NRA's overhead, the Foundation has remained committed to its charitable mission, including supporting the NRA's charitable programs. The Foundation has continued to reimburse the NRA for the fair market value of services actually provided—including paying more than $925,000 in 2026 for grant administration, Friends of NRA operations, and related functions—and has continued to make warehouse space available at no cost. The Foundation has also pledged more than $7 million in grant support for qualifying NRA programs in 2026 and has already distributed more than half of those funds.

**H.    Unable to Raid the Foundation's Coffers the NRA Turns to Other Affiliates.**

48.    While the Foundation's corporate governance reforms have permitted the Foundation to protect its assets, other NRA affiliates, like the NRA Special Contribution Fund,

17

a/k/a, the Whittington Center, have not been so lucky. The Whittington Center is the operational name of a 501(c)(3) affiliate of the NRA with large real estate holdings in New Mexico. With more than 33,000 acres, the Whittington Center was established by the NRA in 1976, and it has since grown into one of the largest public shooting ranges in the United States. It was formed to host competitive shooting events, law enforcement, and military training, as well as for public recreational use. It was funded by a $3 million loan from the NRA on or about September 25, 1975.

49.     The assets of the Whittington Center have substantial value, and the value has grown exponentially over the years during its existence as a result of the governance of the Whittington Center Board and management by its senior leadership.

50.     Although the NRA appoints board members to the Whittington Center Board, and despite the entities' affiliation, the Whittington Center is a separate and independent legal entity from the NRA.

51.     When the NRA was embroiled in both the DC AG and NY AG litigation, the NRA saw its cash flow deteriorating and was strapped for operating funds. To prop up the NRA and ensure it had resources to continue operating and funding its mounting legal bills, the NRA demanded that the Whittington Center pay off the original $3 million loan *with compounded interest* amounting to $8,620,649.66 on or about May 22, 2020. Wanting to be free of the NRA's financial control, the Whittington Center Board approved payment of the money to the NRA, paying off the restructured note on or about November 2021. Those funds were quickly depleted by the NRA.

18

52.     On information and belief, very little of the monies from the Whittington Center actually funded NRA charitable programs or advocacy but rather the NRA's mounting legal expenses and other wasteful spending.

53.     More recently, the NRA effected a board change at the Whittington Center, more than doubling the board's size and stacking it with NRA directors, so that it could exercise unfettered control over the Whittington Center's coffers.

## I.     The NRA Retaliates Against the Foundation.

54.     Following the Foundation's refusal to (a) subsidize the NRA's wasteful operations and bloated payroll; (b) allow the NRA to control the Foundation operations; or (c) allow the NRA to raid the Foundation's coffers, the NRA retaliated. Its management, including Doug Hamlin and William Bachenberg, proceeded to block the Foundation's access to its donor lists and refused to provide the Foundation contact information for Foundation donors, even though the NRA knows that many of the Foundation's endowment agreements require the Foundation to provide annual endowment reports to endowment holders.

55.     The NRA also barred Foundation management's access to Foundation social media accounts and refused to permit the Foundation to oversee training and meetings for Friends of NRA Events. Despite the fact that the Foundation funded 100% of these activities and carried the legal responsibility to ensure its fundraising activities and donor engagement comply with state and federal law, the NRA refused to permit Foundation management to exercise any oversight over Friends Events or the Friends social media account. As a result, the Foundation informed the NRA that it could no longer pay for and assume 100% of the legal risk for Friends Events.

56.     Rather than acknowledging that the Foundation could not assume the legal risk for a program over which it had no oversight, NRA management falsely accused and continues to

accuse the Foundation of "slash[ing] its support for NRA programs" and causing Friends of NRA employees to lose their jobs, when in reality the NRA has no other choice but to cut its overhead to improve its balance sheet.

57. The NRA further shut down the Foundation's website. It redirected hyperlinks embedded in its own website, which used to link to the Foundation's website, back to the NRA's homepage or its own donation solicitation page, where one visiting the site could be led to believe it was making a tax-deductible donation to the Foundation rather than a non-deductible donation to the NRA. The NRA has also retitled the Foundation's social media accounts to "Friends of NRA HQ" and used it to post misleading and inaccurate statements suggesting that certain NRA charitable programs have been funded by the NRA instead of the Foundation.



58. The NRA's actions raise significant legal and regulatory concerns. Misleading the public about the source and flow of charitable funds constitutes a violation of state charitable solicitation laws and consumer protection statutes. Public confusion regarding fundraising can trigger IRS scrutiny and even cause the IRS to recharacterize donors' 501(c)(3) contributions as 501(c)(4) contributions, causing donors to lose their tax deductions. The NRA has refused to comply with the Foundation's request not to misrepresent the source of Foundation grant funds.

59. Finally, the NRA has refused to relinquish to the Foundation millions of dollars of assets that have been donated to the Foundation, including valuable and historic collections of artwork and firearms.

**J.** **The NRA Files a Lawsuit to Mislead Its Auditor and the Public About Its Financial Position.**

60. As discussed above, ASC 958-810 is the applicable GAAP standard for determining when nonprofit entities must consolidate financials. To meet the standard, the nonprofit must have "control" over the other entity, meaning it has the ability to determine the direction of another organization's management and policies. In 2024, NRA management persuaded its auditor that, notwithstanding the Foundation's amendments to its Bylaws removing the NRA's power to appoint members of the Foundation's board, the Foundation's assets could still be reported in the NRA's 2024 consolidated financials because the NRA still held a majority of seats on the Foundation's Board. That changed in the fourth quarter of 2025, when the Foundation's Board became majority independent.

61. The NRA thereafter filed a lawsuit in the U.S District Court for the District of Columbia, falsely claiming that the amendments to the Foundation's Bylaws and Articles of Incorporation were done in secret, without the NRA's knowledge, and without notice to the NRA's *ex officio* trustees. The NRA's Amended Complaint in that action, however, fails to disclose that

*ex officio* trustee and NRA President, Bob Barr, attended the meeting, nor does it disclose the extensive email correspondence with *ex officio* trustee and Executive Vice President, Doug Hamlin, showing that he had *actual notice* of the meeting, *reviewed* the proposed changes to the Articles and Bylaws, and *agreed* with the changes. To suggest otherwise is false and misleading.

62.    The NRA also asserted various trademark claims against the Foundation, disregarding that the NRA provided perpetual consent to the Foundation to use the name The NRA Foundation, Inc., and without disclosing that the Foundation also has a written license to use the NRA's marks, which—to the Foundation's knowledge—has not been terminated consistent with its terms. Put differently, the NRA's lawsuit was designed to mislead its auditors and the public, while pressuring the Foundation to cede control of its assets to the NRA.

63.    Indeed, the NRA used the existence of that lawsuit to justify to its auditor that the Foundation's amendments to its Bylaws and its Articles were improper to claim that it still maintains "control" over the Foundation for purposes of the ASC 958-810 standard for consolidating the financial statements of nonprofit entities. If the Foundation's financials were not included in the NRA's balance sheet, the NRA's reported total assets would decrease by approximately $179 million (from $362 million to $183 million), and total net assets would decrease by approximately $176 million (from $257 million to $81 million), and revenue would drop by approximately $25 million. With these changes, it is unlikely the NRA could obtain a going-concern opinion from its auditor, revealing a strong financial incentive to file its pretextual and retaliatory lawsuit against the Foundation.

64.    On or around March 26, 2026, the NRA submitted a Management Representation Letter to its auditor on behalf of the NRA and its affiliates ("Representation Letter"). Two employees in the NRA's Office of Treasurer, who historically devoted substantial time to

Foundation accounting matters, signed the Representation Letter to the auditor on the Foundation's behalf from the NRA headquarters' IP address. The Representation Letter contained the following statement purportedly made by Foundation management:

> We conclude that [NRA] has maintained control over the Foundation primarily because: 1) it holds a majority voting interest due to the reservation of the right to appoint the members of the Foundation's Board of Trustees and the ex officio status of two NRA officers (President and EVP of NRA) on the Foundation's Board and we believe the amendments made to the Articles of Incorporation and the bylaws in 2024 and 2025 did not follow regulatory and legal requirements, thus ruled out as evidence to the contrary; and 2) we have an economic interest in the NRA Foundation which requires us to consolidate the NRA Foundation.

65. The Representation Letter further asserts that consolidation of the Foundation is "necessary" under ASC 958-810.

66. Neither the Foundation's Board nor management team were asked or given the opportunity to review the Representation Letter, nor did the Foundation Board or management authorize the NRA employees to sign the Representation Letter on the Foundation's behalf before sending it to the NRA's auditor. The Representation Letter is intended to mislead the NRA's auditor and the public about the strength of the NRA's financial position at the Foundation's expense. Specifically, if the NRA's creditors rely on the consolidated financials and the statements made by NRA employees on the Foundation's behalf, there is a very real risk that the NRA's creditors will go after the Foundation's assets, because—unlike the NRA—the Foundation will remain solvent.

## V.

## CLAIMS

### COUNT I: TORTIOUS INTERFERENCE WITH CONTRACTS

67. The Foundation realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

68.     The Foundation has existing contracts with donors who have contributed to the Foundation over its 35-year history, including with endowment holders pursuant to endowment agreements. Many of those endowment agreements require the Foundation to provide annual reports to endowment holders.

69.     The NRA, with full knowledge of these agreements, intentionally interfered with them by refusing to provide the Foundation the contact information needed to provide the endowment holders the annual reports required under their respective contracts.

70.     The NRA's interference was intentional, without justification, and has caused and continues to cause the Foundation substantial damages, including loss of donor relationships, loss of fundraising revenue, and reputational harm.

### COUNT II: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

71.     The Foundation realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

72.     The Foundation has valid and existing business relationships with its donors, including individuals and entities that have contributed to the Foundation through the Friends of NRA program and other fundraising efforts, as well as prospective donors.

73.     The NRA, with full knowledge of these existing business relationships, intentionally and improperly interfered with the Foundation's business relationships and prospective business relationships in violation of Virginia common law by, among other things:

      a.     Blocking the Foundation's access to its donor lists and refusing to provide donor contact information; and

      b.    Making misleading statements on Foundation social media accounts suggesting that certain charitable programs were funded by the NRA instead of the Foundation.

74.    The NRA's interference was intentional and designed to cause confusion among and mislead existing and prospective donors and to improperly divert funds lawfully intended for the Foundation.

75.    The Foundation's inability to access its donor list and contact its donors directly is damaging its ability to collect donations necessary to carry out its charitable purpose.

76.    This interference is irreparable, and the Foundation seeks injunctive relief directing the NRA to immediately return the Foundation's assets in its possession, including the Foundation's extensive donor list and administrative access credentials to the Foundation's social media accounts.

77.    As a direct and proximate result of the NRA's tortious interference, the Foundation has suffered damages in an amount to be determined at trial.

## COUNT III: CONVERSION

78.    The Foundation realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

79.    The Foundation is the lawful owner of millions of dollars' worth of artwork, firearms, and other property that was donated to the Foundation, which is currently in the NRA's possession.

80.    The NRA has wrongfully exercised dominion and control over the Foundation's property by: (a) refusing to return the Foundation-owned artwork and firearms upon demand; and (b) using these assets without authorization.

81.     The NRA has acted willfully and in knowing disregard of the Foundation's rights.

82.     The NRA's wrongful detention, use, and refusal to return Foundation property has caused and continues to cause the Foundation damages.

## COUNT IV: FRAUDULENT MISREPRESENTATION

83.     The Foundation realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

84.     The NRA intentionally made material misrepresentations to its auditor to justify including the Foundation's assets in its consolidated financials. It did so with the expectation that third parties would rely on those financial statements to the Foundation's detriment.

85.     The NRA filed a baseless lawsuit, alleging that the Foundation failed to provide notice of the August 23, 2024 board meeting to Doug Hamlin, the NRA's Executive Vice President and CEO and former *ex officio* member of the Foundation Board. Yet, the NRA knew (or should have known) this allegation was false because an August 22, 2024 email from Hamlin to Foundation counsel shows that Hamlin received notice of the meeting on August 21, 2024, reviewed the proposed amendments to the Articles of Incorporation and Bylaws, asked questions about the proposed changes, and agreed to the changes.

86.     The NRA further directed two of its employees to sign a Representation Letter dated March 26, 2026, to its auditor on the Foundation's behalf. The NRA did so without the Foundation's knowledge, authorization, or consent. The Representation Letter falsely asserted that the NRA has "maintained control over the Foundation." It further falsely stated that the Foundation's 2024 and 2025 governance amendments "did not follow regulatory and legal requirements, thus ruled out as evidence to the contrary" of consolidation. These representations

26

were false and were made by individuals who, as NRA employees, had no authority to speak for the Foundation.

87.     The NRA's misrepresentations were made with knowledge of their falsity, or with reckless disregard for their truth, with the intent to induce reliance by the NRA's auditor and third parties who depend on the accuracy of the financial statements. The NRA's purpose was to justify continued consolidation of the Foundation's approximately $179 million in net assets on the NRA's financial statements and to avoid a going-concern qualification in its audit report. The NRA's Representation Letter itself concedes that deconsolidation would strip approximately $179 million in total assets and $176 million in net assets from the NRA's consolidated financial statements.

88.     The Foundation has suffered damages as a result of the NRA's misrepresentations in an amount that exceeds the jurisdictional limit.

## REQUEST FOR JURY TRIAL

The Foundation requests a jury trial on all issues for which it is entitled under the law.

## VII.

## PRAYER FOR RELIEF

WHEREFORE, the Foundation respectfully prays that Defendant be duly served and cited to appear and after due proceedings, this Court enter judgment in the Foundation's favor and grant the following relief:

### A.     Declaratory Judgment

89.     The Foundation repeats and realleges the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

27

90.    An actual and justiciable controversy exists between the Foundation and the NRA concerning:

a.    The validity of the amendments to the Foundation's Articles of Incorporation and Bylaws adopted in August 2024 and July 2025;

b.    The validity of the Foundation's Board of Trustees' ratification, confirmation, and approval of all prior actions taken by the Board since incorporation, including all amendments to the Articles of Incorporation and Bylaws;

c.    Whether the Foundation is properly consolidated with the NRA under ASC 958-810; and

d.    Whether the NRA has control over the Foundation within the meaning of ASC 958-810 or otherwise.

91.    The Foundation is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that:

a.    The amendments to the Foundation's Articles of Incorporation and Bylaws adopted on August 23, 2024, are valid and enforceable;

b.    The NRA has no right, title, or interest in Foundation grant funds other than as expressly stated in written grant agreements with the Foundation or as third-party beneficiary to endowment agreements, where an NRA qualified program is designated as a beneficiary;

c.    The NRA does not have control over the Foundation within the meaning of ASC 958-810 or otherwise; and

d.    Artwork, firearms, and other assets donated to the Foundation are the property of the Foundation.

28

**B.    Injunctive Relief**

92.    The Foundation repeats and realleges the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

93.    The NRA's ongoing conduct, as described herein, is causing and will continue to cause irreparable harm to the Foundation for which monetary damages are an inadequate remedy.

94.    The Foundation is likely to succeed on the merits of its claims against the NRA.

95.    The balance of hardships tips in the Foundation's favor, and the public interest favors the issuance of injunctive relief to protect the Foundation's charitable mission and the interests of donors who have contributed to the Foundation.

96.    The Foundation is entitled to injunctive relief, both preliminary and permanent, requiring the NRA to:

    a. Cease making misleading statements to the public, donors, auditors, and regulators about the Foundation, the Foundation's relationship with the NRA, and the source of funding for charitable programs;

    b. Return all property that was donated to the Foundation, including the Foundation's art and firearms collections;

    c. Cease representing to auditors, regulators, or the public that the NRA controls the Foundation or that consolidation of the Foundation is appropriate under ASC 958-810; and

    d. Cease using Foundation assets, goodwill, or donor relationships to benefit NRA affiliates.

**C.    Damages**

97.    The Foundation is entitled to and respectfully requests an award of monetary damages, including:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive or exemplary damages due to the NRA's knowing and willful fraudulent misrepresentations;

c. Pre-judgment and post-judgment interest;

d. The Foundation's costs and reasonable attorneys' fees to the extent permitted by law; and

e. Such other and further relief as the Court may deem just and proper.

Dated: June 25, 2026

Respectfully submitted,

**DLA PIPER LLP**

*/s/ Mary Gately*
Christopher Oprison (VSB No. 41765)
200 S. Biscayne Blvd., Suite 2500
Miami, FL 33131
Tel: (305) 423-8522
Fax: (305) 657-6366
chris.oprison@dlapiper.com

Mary E. Gately (VSB No. 28845)
500 Eighth Street NW
Washington, DC 20004
Tel: (202) 799-4507
Fax: (202) 799-5507
mary.gately@dlapiper.com

Meagan D. Self (*pro hac vice* application
forthcoming)
1900 N. Pearl Street, Suite 2200
Dallas, TX 75201
Tel: (214) 743-4556
Fax: (972) 813-6254
meagan.self@dlapiper.com

Marie Bussey-Garza (*pro hac vice*
application forthcoming)
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103
Tel: (215) 656-3300
Fax: (215) 656-3301
marie.bussey-garza@dlapiper.com

*Attorneys for Plaintiff The 1791
Foundation, Inc., formerly known as The
NRA Foundation, Inc.*

31